**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| SKYWAY BROKERAGE, INC., ) | | |
|     Plaintiff, ) | | |
| ) | | |
|     v. ) | Case No. | |
| ) | | |
| SUMMA LOGISTICS, INC., ) | Judge | |
|     Defendant. ) | | |

**<u>VERIFIED COMPLAINT</u>**

NOW COMES the Plaintiff, SKYWAY BROKERAGE, INC., an Illinois Corporation (hereinafter "SKYWAY"), by and through its attorney, IGOR BOZIC, and complain of the Defendant, SUMMA LOGISTICS, INC., (hereinafter "SUMMA"), upon personal information as to their own activities and upon information and belief as to the activities of others and all other matters, and state as follows:

**JURISDICTIONAL ALLEGATIONS**

1. The Plaintiff, SKYWAY is an Illinois Corporation doing business in Illinois and having a registered office at 777 S Rohlwing Rd, Addison, IL 60101.

2. Defendant SUMMA is an Iowa corporation with a registered address of 812 Washington Street, Suite 102, Burlington, Iowa 52601, conducting business in Illinois.

3. Because the subject matter of this case involves the transportation of property between a place in one state and a place in another state, this court has exclusive jurisdiction under the Carmack Amendments (49 USC Section 13501).

4. On or about November 17, 2020, Parties agreed to the exclusive jurisdiction to the Federal Court in the Northern District of Illinois. Attached as EXHIBIT 1, is a copy of the

agreement between SKYWAY and SUMMA (hereinafter "Agreement") and incorporated in this Complaint as if fully stated herein.

5. An actual case or controversy has arisen between the parties.

6. Plaintiff has been injured by Defendant and suffered damages resulting therefrom.

## GENERAL ALLEGATIONS

7. Plaintiff re-alleges paragraph 1-6 above as if fully stated herein.

8. SKYWAY acted as the freight broker on behalf of its customer, DSV, with respect to a load, load number 113108, of twenty-four (24) pallets of Freight of All Kind (FAK) (hereinafter "the Shipment").

9. SKYWAY retained SUMMA to act as the freight carrier for the Shipment with the pickup location at the O'Hare Airport, China Airline, Illinois and delivery location to General Motors in Arlington, Texas. Attached as EXHIBIT 2 and incorporated in this Complaint as if fully stated herein, is a copy of the Rate/Dispatch Confirmation.

10. SUMMA agreed to pick-up all twenty-four (24) pallets. *See* EXHIBIT 2.

11. On February 12, 2022, SUMMA's driver arrived at O'Hare Airport, confirmed that the Driver was allowed to go inside and count the product and that the driver is loaded.

12. SUMMA only picked up eight (8) out of twenty-four (24) pallets.

13. While the cargo was in transit, SUMMA again confirmed that all twenty-four (24) pallets were loaded.

14. SUMMA agreed that acceptance of the goods by it shall mean that SUMMA inspected the goods, that goods are in good order and that SUMMA immediately and effectively assumes full liability for such goods, until proper delivery is made to the consignee. (*See* Paragraph 8 of the Agreement).

15. SUMMA agreed that it shall defend, indemnify, and hold harmless SKYWAY and its customers from and against any and all liabilities. (*See* Paragraph 12 of the Agreement).

16. On or about February 25, 2022, SKYWAY received an e-mail from its customer that sixteen (16) out of twenty-four (24) pallets are still in the storage at the O'Hare Airport and were never picked up by SUMMA, and at all time were incurring storage fees.

17. To mitigate damages, SKYWAY paid the above stated storage fees in the amount of $43,268.40.

18. Further, SKYWAY paid another motor carrier in the amount of $3,021.00 to deliver the rest of the Shipment.

19. As a result, SKYWAY incurred liabilities totaling $46,289.40 in storage fees and service fees.

## COUNT I
## BREACH OF CONTRACT

20. PLAINTIFF restates the allegations contained in Paragraph 1 – 19 above as if fully stated herein.

21. PLAINTIFF and SUMMA had an agreement whereby SUMMA shall pickup 24 pallets of freight.

22. SUMMA agreed that acceptance of the goods by it shall mean that SUMMA inspected the goods, that goods are in good order and that SUMMA immediately and effectively assumes full liability for such goods, until proper delivery is made to the consignee. (*See* Paragraph 8 of the Agreement).

23. Further, SUMMA agreed to defend, indemnify, and hold harmless SKYWAY and its customers from and against any and all liabilities. (*See* Paragraph 12 of the Agreement).

24. PLAINTIFF performed all of its obligations under the Agreement.

25. PLAINTIFF demanded from SUMMA to be indemnified for its losses by March 1, 2022.

26. SUMMA never indemnified PLAINTIFF.

27. Because of SUMMA's breach of the Agreement, PLAINTIFF sustained damages.

## COUNT II
## NEGLIGENCE

28. PLAINTIFF restates the allegations contained in Paragraphs 1 -27 above as if fully stated here.

29. SUMMA is a carrier providing shipping services.

30. SUMMA acted as a contractor for PLAINTIFF for the Shipment.

31. SUMMA owed PLAINTIFF certain duties, including but not limited to:

    a. To exercise reasonable care with regard to the Shipment;

    b. To exercise the skill or knowledge pertaining to the nature of its business;

    c. To be responsible for the proper care and handling of freight moving under the Agreement.

    d. To make sure all pallets are loaded and/or accounted for.

    e. Or, if all pallets are not loaded and/or accounted for, to timely advise the PLAINIFF of such omissions.

32. SUMMA breached its duties to PLAINTIFF, by way of illustration and not limitation, by:

    a. Picking up partial Shipment.

    b. By stating that all 24 pallets were loaded.

    c. Failing to inspect the Shipment.

33. SUMMA's acts or omissions were a proximate and direct cause of SKYWAY's injuries and damages.

WHEREFORE, Plaintiff prays:

A. That the Court enters judgment for Plaintiff on all claims for relief asserted in the Complaint as determined at the trial;

B. That the Court enters judgment in favor of Plaintiff for pre-judgment and post-judgment interest at the legal rate;

C. That the Court awards Plaintiff reasonable attorney's fees and expenses of litigation;

D. That all costs be assessed against Defendant(s); and

E. That the Court awards such other relief as shall appear proper and just, including but not limited to injunctive relief.

This 14th day of March, 2022.

RESPECTFULLY SUBMITTED,

/s/Igor Bozic

_____

Igor Bozic, Esq.

NORTH AMERICAN
TRANSPORTATION ADVOCATES, P.C.
Attorney Igor Bozic
ARDC 6315224
777 S Rohlwing Rd
Addison, IL 60101
312-858-8209
info@nata-law.com

## **VERIFICATION**

I, Miljenko Vuckovic, being first duly sown upon oath depose and state as follows:

1. That I am an agent for the Plaintiff herein and that I have custody and control of the files relating to this account;
2. That I have personal knowledge of all the facts and circumstances in connection with this case;
3. That said files are maintained in the usual and ordinary course of business;
4. That this action is based upon a theory of breach of contract, and negligence, and that the moneys sought are for damages alleged to have been incurred as a direct result of said breach or negligence;
5. That if called upon, affiant can testify at trial as to all facts pertaining to this matter.

I verify under penalty of perjury, pursuant to 28U.S.C. §1746, that the foregoing is true and correct.

03/14/2022                          /s/Miljenko Vuckovic

Dated                                     Authorized Agent

NORTH AMERICAN
TRANSPORTATION ADVOCATES, P.C.
Attorney Igor Bozic
ARDC 6315224
777 S Rohlwing Rd
Addison, IL 60101
312-858-8209
info@nata-law.com

# EXHIBIT 1



## Signed Agreement Affidavit

**On behalf of SUMMA LOGISTICS INC (DOT#: 2876280) with offices at 100 S SAUNDERS RD STE 150, LAKE FOREST , IL 60045, on 11/17/2020, Nikola Milic, President, agreed to Skyway Brokerage Inc's online agreement, version #: [Skyway Brokerage%2c Inc eAgreement V5.pdf 2020.11.01.18.25.15].**

**Details:** On 11/17/2020, Nikola Milic, President, securely signed in to www.mycarrierpackets.com from IP Address 73.211.108.83:64602 using the confirmed and password protected username of Summa. During the carrier's online registration, Nikola Milic, President, certified under penalty of perjury under the laws of the United States of America to having authorization by SUMMA LOGISTICS INC to sign agreements on their behalf.

Email receipt of the signed agreement was sent to dispatch@summalogistics.us on 11/17/2020.

## e-Agreement Table of Content:

- Pay Terms and Conditions
- Property Broker/ Carrier Agreement

This AGREEMENT is entered into on the date specified via an online portal, MyCarrierPackets.com, evidenced by the Signed Agreement Affidavit between the carrier named on the Signed Agreement Affidavit (hereinafter referred to as "CARRIER"), a for-hire motor carrier (i) registered with and operating under for-hire motor carrier authority Certificate or Permit No. MC specified via an online portal, MyCarrierPackets.com, evidenced by the Signed Agreement Affidavit and issued by the FMCSA or its predecessors, and/or (ii) registered with and operating under for-hire motor carrier registration or authority No. specified via an online portal, MyCarrierPackets.com, evidenced by the Signed Agreement Affidavit issued by a state agency and Skyway Brokerage, Inc. (hereinafter referred to as "PROPERTY BROKER" or "BROKER"), a property transportation broker registered with and operating under property transportation broker license MC No. 633722 and DOT No. 2241363 issued by the U.S. Federal Motor Carrier Safety Administration (the "FMCSA") or its predecessor agencies within or outside the U.S. Department of Transportation ("U.S.DOT"). BROKER AND CARRIER shall be referred to collectively as the "Parties" and individually as a "Party".

### Pay Terms and Conditions

By CARRIER selecting a payment option via MyCarrierPackets or any other avenue by BROKER, CARRIER agrees to one of the following payment options:

Direct Deposit

- Electronic payment (no fee) ACH will be initiated 30 days after receipt of paperwork. No cash advances!!!

Check Payment

- Standard option (no fee) Check will be issued 30 days after receipt of paperwork. No cash advances!!!

### **PROPERTY BROKER/ CARRIER AGREEMENT**

WHEREAS, Broker has been issued a property broker license by the Federal Motor Carrier Safety Administration ("FMCSA") and plans to arrange for the transportation of shipments for various shippers.

WHEREAS, Carrier is engaged in business as a motor contract carrier, and has been issued an operating authority by the FMCSA (or its predecessor, the Interstate Commerce Commission ("ICC"), which authorizes Carrier to provide transportation service for the shipments tendered to it by Broker.

NOW, THEREFORE, in consideration of the mutual promises and other valuable considerations, the parties agree as follows:

1. Carrier warrants that it holds contract motor permit operating authority issued by the FMCSA or the ICC, which authorizes the transportation of commodities on behalf of Broker or Broker's customers.

2. Carrier warrants that is duly certificated motor carrier pursuant to the standards and regulations of FMCSA or ICC, and Carrier warrants that FMSCA or ICC has authorized Carrier as fit to operate on the roadways of the North American Continent and has not placed Carrier out of service or designated Carrier as "Unsatisfactory" or restricted Carrier's authorization to operate in any manner whatsoever that would render Carrier unable or unauthorized to perform under the terms of this Agreement. Carrier shall immediately notify Broker of any change in Carrier's standing rendering it "Unsatisfactory" or otherwise unable or unauthorized to perform under the terms of this Agreement.

3. Broker warrants that it is licensed as a property broker to arrange for the transportation of property.

4. Carrier shall receive from Broker such quantity of goods on behalf of Broker as may be tendered for transportation from time to time, and Carrier shall make all reasonable efforts to have the required equipment available to transport said shipments. Carrier warrants that its equipment is maintained in good order, and is suitable for the transportation of the shipments tendered to it. Carrier shall transport and carry said goods without delay caused by anything within Carrier's control. In the event a shipment is rejected, in part or in whole, by the consignee, the Carrier shall immediately contact

Broker and shall immediately follow Broker's instructions as to where to transport and/or otherwise dispose of the goods. The same mileage rate shall apply from the consignee destination to the new location as directed by Broker.

5. With respect to transportation services provided herein, Carrier shall comply with all federal, state, and local laws, including, but not limited to, laws governing the safe operation of commercial vehicles, employment laws, hazardous material laws, etc. As an independent contractor, as set forth in Paragraphs 12 and 15, Carrier agrees to defend, indemnify and hold harmless Broker and its customer, shippers, consignors and/or consignees (hereinafter "Broker's Customers") from and against all fines, penalties and liabilities resulting from Carrier's failure to comply with such laws, rules, regulations and ordinances. Broker hereby disclaims any and all carrier duties, and by, executing this Agreement, Carrier expressly accepts and affirms said disclaimer.

6. Carrier agrees to carry such goods at the rates, charges, and rules as set forth in this agreement, "**Schedule A"** and/or "**Load and Rate Confirmation**," which shall be signed by Carrier and transmitted by Carrier to Broker by facsimile, email (or other electronic means) for each shipment accepted by Carrier under this Agreement. Carrier's receipt of "**Schedule A**" and/or "**Load and Rate Confirmation**", and not the signature, shall constitute a binding agreement to the terms of such a document, unless objected to and renegotiated in writing by both parties prior to the acceptance of the load. Carrier and Broker agree that any common carrier tariff rates, accessorial charges, rules and regulations do not apply, in any fashion, to any shipment tendered under this Agreement. Any change in rates, charges or rules and regulations hereunder shall be mutually agreed to and confirmed in writing, signed by both parties. Carrier also agrees that any detention, loading, unloading, lumper, layover accessorial, turnpike fees, tolls, maintenance, and/or, any other expenses shall not be paid by Broker without its prior written approval.

7. Carrier shall sign a bill of lading or other form of receipt acceptable to Broker when it picks up the shipment. By signing such documents, Carrier represents that it is the properly licensed motor carrier that is assuming the legal obligation to transport the tendered shipment. To the extent any terms of the bill of lading or receipt are inconsistent with the terms of this Agreement; the terms of this Agreement shall govern. Every shipment tendered to Carrier shall be deemed to be tendered to Carrier as a motor contract carrier and shall be subject only to the terms of this Agreement and the provisions of law applicable to motor contract carriage, unless otherwise expressly stated herein. Statutory provisions and regulations which are waivable under 49 U.S.C. § 14101 (b) and related sections, and which are inconsistent with the terms of this Agreement, are hereby expressly waived; the terms of this Agreement shall govern.

8. Carrier shall ensure that Broker's name is not listed as the "carrier" on the billing of lading. Carrier agrees that a Shipper's insertion of Broker's name as the carrier on a bill of lading shall be for the Shipper's convenience only and shall not change Broker's status as a property broker nor Carrier's status as a motor carrier. Broker is not a motor carrier and assumes no motor carrier responsibility for cargo loss and damage. Acceptance of the goods by Carrier shall mean that Carrier inspected the goods, that goods are in good order and Carrier immediately and effectively assumes full liability for such goods, until proper delivery is made to the consignee. Where trailers are spotted for the consignor's or consignee's convenience at point of origin and/or destination, Carrier's full liability begins when the trailer is picked up by Carrier and terminates when the trailer is spotted for delivery and the consignee is notified. The bill of lading/receipt shall be prima facie evidence of the actual receipt by Carrier of such goods in good order and condition, unless otherwise expressly noted on the face of such document. All such documents shall show the actual consignor and consignee.

9. Carrier agrees to invoice Broker and only Broker. Carrier agrees not to invoice any of Broker's Customers (including, but not limited to, the shipper, consignee and consignor) for shipments tendered under this Agreement. Carrier agrees that Broker has the exclusive right to handle all billing of freight charges to Broker's Customer (including, but not limited to, the shipper, consignee and consignor) for the transportation services provided herein, and, as such, Carrier expressly agrees to refrain from all collection efforts against Broker's Customers (including, but not limited to, the shipper, receiver, consignor, and consignee), unless advance authorization is given in writing by Broker. Carrier agrees that unauthorized contact with Broker's Customers in regards to the payment for carrier services shall result in $10,000.00 in liquidated damages in addition to actual damages such as, but not limited to, loss of business with such customer. Broker agrees to pay Carrier for the transportation of shipments under this Agreement in accordance with the rates described in Paragraph 6 above, within thirty (30) days of receipt of Carrier's invoice and signed delivery document covering such transportation; provided, however, Carrier agrees that said invoice shall not be paid until Broker has received payment from the shipper for the shipment in question. Carrier invoices not submitted to Broker within sixty (60) days of shipment as specified on the applicable bill of lading are waived. Further, Carrier hereby waives all claims for freight charges against any party (including, but not limited to, Broker, Broker's Customer, the shipper, the consignee and the consignor) if a lawsuit is not filled and served within nine (9) months of shipments as specified on the appropriate bill of lading. Actions of the Carrier (such as unreasonable delay, shortage, loss, etc.) which result in non-payment or delay in payment to Broker by Shipper, shall, likewise, affect (including delay and/or set-off) final settlement to the carrier.

Further, compensation paid under this Agreement may be withheld, in whole or in part, by Broker to satisfy this obligation. Broker reserves the right to deduct an amount equal to the loss, damages, or spoilage on any shipment as a result of the negligence or alleged negligence on the part of the Carrier, its contractors, agents, servants or employees for the same or any other shipment; provided, however, that Broker shall furnish to Carrier a written explanation and itemization of all deductions computed at the time deductions are made. Carrier shall not withhold any goods of any Customer on account of any dispute as to rates or any alleged failure to receive payment of freight charges incurred under this Agreement. Carrier further agrees that Broker has the discretionary right to offset any payment owed to Carrier hereunder for liability incurred under this Agreement.

10. Carrier shall maintain, at its own cost at all times during the term of this Agreement, the following insurance policies:

   a. Commercial Automobile Liability Insurance policy for primary liability insurance in an amount not less than One Million Dollars ($1,000,000.00) or such higher insurance coverage as may be required by law, which policy shall provide coverage for public liability, property damage, environmental restoration, and injury or death to persons resulting from the performance of transportation service under this Agreement. Such insurance shall be primary and not contributory to any coverage available to Broker and Broker's Customers.

   b. Commercial General Liability Insurance, including contractual liability and protective liability coverage (consistent with the indemnity obligation herein) in a combined single limit of not less than One Million Dollars ($1,000,000.00) per occurrence.

   c. Motor Truck Cargo Liability Insurance insuring carrier against liability for loss or damage to cargo and commodities while in the custody, possession or control of Carrier in an amount not less than One Hundred Thousand Dollars ($100,000.00) or such higher insurance coverage as may be required by law or by Broker from time to time.

   d. Refrigeration Breakdown Insurance with Change in Temperature/Spoilage Coverage insuring Carrier against liability for loss or damage to cargo and commodities while in the custody, possession or control of Carrier due to mechanical or electrical breakdown or malfunction of temperature control system, as well as, but not limited to, human error or lack of fuel, in an amount not less than One Hundred Thousand Dollars ($100,000.00) or such higher insurance coverage as may be required by law or by Broker from time to time.

These insurance policies providing coverage shall be written by a reputable insurance company. These policies shall also provide that the insurance company issuing such policies shall notify both the Carrier and Broker of its intention to cancel any policy as least ten (10) days prior to the effective date of cancellation. Carrier shall furnish, at Broker's request, a Certificate or Certificates of Insurance designating Broker as Certificate Holder. The aforementioned insurance requirements are minimum requirements and shall not limit Carrier's liability to Broker in any manner.

Carrier, upon reasonable demand, shall deliver to Broker copies of its ICC Operating Authority and Certificate of Insurance, insuring Carrier's liability for personal injury, property damage, loss or damage to cargo, and refrigeration breakdown. Upon request of Broker, Carrier shall have its insurance amended to include insurance of Broker as its interest may appear.

11. Carrier shall be responsible for the proper care and handling of freight moving under this Agreement, and shall be liable to Broker and Broker's Customers for the full actual loss, damage, or injury to property occurring while in the custody, possession or under the control of Carrier, its employees, or its contractors and agents. For purposes of this Agreement, the term "full actual loss" shall mean the value of the cargo as determined by Shipper.

Except as otherwise provided herein, Carrier shall be liable for cargo loss and damage in accordance with federal law (49 U.S.C. §14706) with respect to all shipments. Except as otherwise provided herein, cargo claims shall be filed in accordance with 49 C.F.R. 370. If loss or damage does occur, Broker's client(s), or Broker on behalf of such client(s), shall submit a claim in writing to Carrier, within nine (9) months of delivery date, or scheduled delivery date, whichever is later. A claim shall not be invalidated if the exact amount of this claim is not quantified within nine (9) months. Carrier shall acknowledge receipt of claim in writing within thirty (30) days of receiving such claim, and Carrier shall resolve (pay in full, partial payment, or decline payment for just cause) such claim within one hundred twenty (120) days of filling date. Failure on the part of the Carrier to comply with this specific provision, to wit: the thirty (30) day response deadline, shall constitute a waiver of Carrier's defenses to the cargo claim and any associated lawsuit by both Broker and Broker's Customers.

Rev. 11/01/2020

12. Carrier shall defend, indemnify, and hold harmless Broker and Broker's Customers from and against any and all liabilities, judgments, fines, claims, lawsuits, penalties, orders, decrees, awards, costs, expenses, including but not limited to attorney's fees, settlements and claims on account of any of the following:

     a. Loss or damage of property (other than cargo), or personal injury, including, but not limited to death, which may be sustained by the parties, their employees or third parties, arising out of or in connection with Carrier's performance of any of the services set forth herein;

     b. Loss or damage to property (other than cargo), or personal injury, including, but not limited to, death, which may be sustained by the parties, their employees or third parties, arising out of or in connection with Broker's performance of any of the services set forth herein, including, but not limited to Broker's own negligence or willful, reckless or wanton conduct;

     c. Loss, damage or delay in transit as to all goods which Carrier receives for transport under this Agreement (to wit: cargo), until Carrier delivers such goods and the same are signed for and accepted by the consignee;

     d. Carrier's breach of any of its representations, warranties and/or covenants in this Agreement; or

     e. Carrier's failure to comply with worker's compensation requirements or any claim for worker's compensation asserted against Broker or Broker's Customers by Carrier's employees or their personal representatives.

This provision will not be construed in any circumstance to constitute an indemnification contrary to any government law that prohibits indemnification against loss, liability, costs or expenses incident thereto caused by the negligence of such indemnity.

13. Carrier acknowledges that its position as carrier for Broker gives it access to special knowledge of Broker and Broker's Customers, organization and business methods ("Business Information") which could be harmful to Broker if used for any purpose other than the promotion of Broker's business as provided in this Agreement. Carrier agrees that, during the term of this Agreement, and for a period of three (3) years from the date of termination of this Agreement, Carrier will not communicate with Broker's Customers or disclose to any third party any of the Business Information it may have gained through its relationship with Broker. Carrier agrees that, in the event of any breach of the covenants contained in this paragraph, Broker will be entitled to, in addition to any other rights and remedies, an injunction or restraining order restraining Carrier from committing or continuing to commit any breach of these provisions, and Carrier hereby consents to the issuance of such injunction or restraining order or other equitable relief without bond or other security and without the necessity of actual damage to Broker.

14. Carrier agrees that, during the term of this Agreement and for a period of three (3) years from the date of termination of this Agreement, that neither Carrier nor any employee, officer, director, contractor, agent or otherwise of Carrier, shall directly or indirectly solicit traffic from any shipper, consignor, consignee, or customer of the Broker where (a) the availability of such shipments first became known to Carrier as a result of Broker's efforts; or (b) the shipments of the consignor, consignee, or customer of the Broker was first tendered to the Carrier by the Broker.

In the event Carrier violates the terms of this Paragraph and back-solicits Broker's customers and obtains traffic from such customers, Broker is then entitled, for a period of thirty-six (36) months after the traffic first begins to move, to a commission from the Carrier of fifteen percent (15%) of the transportation or revenue received on the movement of traffic. Carrier understands and agrees that the provisions of the aforementioned covenant not to compete are reasonable as to scope, duration, and geographic area, in light of the mutual promises and other valuable consideration that parties have agreed to in this Agreement. Further, Carrier agrees that any violation of the covenant not to compete will cause irreparable injury to Broker, and that Broker will be entitled to a restraining order and an injunction to stop the back-solicitation of traffic.

15. The relationship of Carrier to Broker shall, at all times, be that of independent contractor. Carrier shall and does assume full responsibility for all state and federal taxes, assessments, costs and fees arising out of the transportation of goods required herein. Carrier, at its sole cost and expense, shall furnish all equipment required for its services hereunder and shall maintain all equipment in good repair and condition. Carrier, at its sole cost and expense, shall employ for its services hereunder only competent and legally licensed personnel.

16. Without the prior written consent of Broker, Carrier shall not cause or permit any shipment tendered hereunder to be transported by any other motor carrier or in substituted service by railroad or other modes of transportation. Further, Carrier does NOT have the right to assign, allocate broker, forward, or tender the shipment to a third party or

subcontractor. Carrier does not have the right in any way to negate, eliminate, circumvent or alleviate Carrier's liability to Broker or Broker's Customers. Carrier shall be responsible for all liabilities incident to the transportation service rendered by Carrier under this Agreement.

17. Carrier agrees that it will not intentionally delay, retain, seize or assume control of a product or shipment subject to this Agreement, whether as a lien for the payment of freight charges or otherwise.

18. No waiver, alternation or modification of any of the provisions of this Agreement, or any of the Appendices referred to herein, will be binding upon either party unless in writing, signed by an appropriate representative of both parties.

19. This agreement may not be assigned or transferred, in whole or in part, and supersedes all other agreements and all tariffs, rates, classifications and schedules published, filed or otherwise maintained by Carrier. This agreement shall be binding upon and inure to the benefit of the parties hereto.

20. If any provision or portion(s) of the provision of this Agreement is held invalid or unenforceable under any law, rule or regulation, such provision or portion(s) thereof shall be reformed or deleted, but only to the extent necessary to comply with such law, rule or regulation, and the remaining provisions of this Agreement will remain in full force and effect.

21. This agreement, together with any Appendices hereto, constitutes the entire agreement between the parties with respect to the subject matter hereof, and supersedes all prior oral or written representations and agreements.

22. The parties hereby stipulate to the exclusive jurisdiction of the courts situated in DuPage County, Illinois, over any litigation between the parties arising hereunder, except that the case may be removed to the appropriate federal court in the Northern District of Illinois. Carrier shall pay all costs, expenses and attorney fee which may be expended or incurred by Broker or Broker's Customers against Carrier, or in any litigation incurred by Broker because of any act or omission of Carrier under this Agreement. For all purposes herein, Broker shall have the sole, exclusive right to choose its counsel and the sole, exclusive right to determine if that counsel's fees and costs are reasonable.

23. This failure of either party at any time to require performance by the other party of any provision of this Agreement will in no way affect the right to require such performance at any time thereafter, nor will waiver of either party of a breach of any provision of this Agreement constitute a waiver of any succeeding breach of same or any other provision.

24. This agreement shall be for a period of one (1) year from the date of execution hereof and shall automatically renew for additional one (1) year periods, unless canceled by either party by thirty (30) days written notice to the other.

25. This agreement is to be construed according to federal law governing transportation and the laws of the state of Illinois. If any part of this Agreement is determined to be contrary to law, such determination shall not affect the validity of any other terms or conditions.

26. Carrier also declares that the undersigned has fully read this Agreement, that the undersigned has had an opportunity to consult with legal counsel before signing this agreement, that the undersigned fully understands the terms contained herein, and that the undersigned freely, voluntarily and knowingly accepts the consideration and terms contained herein, and in particular, the attorney fees provision in Paragraph 22, for the purpose of making this Agreement.

27. Carrier acknowledges that the goods tendered to it in accordance with ¶4 may consist of food for humans or animals as defined in §201 (f) of the Federal Food, Drug, and Cosmetic Act ("Food Shipments"). Carrier warrants that it is and shall remain in compliance will the laws, regulations, ordinances and rules including, but not limited to, the Food Safety Modernization Act (21 U.S.C. §2201, *et. seq.*) ("FSMA"), the Federal Food, Drug and Cosmetic Act (21 U.S.C. §341, *et. seq.*) ("FD&C Act"), the Sanitary Food Transportation Act (49 U.S.C. §5701, *et. seq.*), the U.S. Food and Drug Administration's Final Rule on the Sanitary Transportation of Human and Animal Food (21 C.F.R. §1.900, *et. seq.*) And all applicable U.S. Department of Agriculture and Food Safety and Inspection Service regulations (collectively, the "Food Safety Laws"). Carrier warrants that it maintains written procedures related to the safe transport of Food Shipments tendered to it by Broker, and trains its drivers and staff regarding safe transport of any Food Shipments and other goods.

Carrier warrants and assumes full liability and responsibility for the sanitary transport of food transported by it. Carrier shall comply with the written instructions of the Broker or of Broker's customer, including without limitation any temperature set point or temperature range, as provided to Carrier in physical or electronic form. If the instructions require a cargo seal, the absence of a seal or any seal irregularities (such as evidence of tampering) shall be sufficient to consider the shipment unsafe or "adulterated" as defined in ¶29 below.

Rev. 11/01/2020

Carrier shall verify the temperature of refrigerated shipments, prior to loading or accepting the load, against the rate confirmation, bill of lading or other documents received by the broker. If there are discrepancies in temperature, or no temperature noted on the documents received, Carrier shall immediately notify Broker and shall not load or otherwise take the load until it receives the correct temperature in writing by the broker. Acceptance of the goods by Carrier shall mean that Carrier inspected the goods, that goods are in good order and immediately and effectively assumes full liability for such goods. Carrier shall write the recorded, set or pre-set temperature on any and all shipping document(s) related to the pick-up, transport, or delivery of Food Shipments, including without limitation any Bill of Lading ("Shipping Document").

Carrier represents and warrants that all Equipment (as defined in the Food Safety Laws) used in transporting Food Shipments is and shall be in safe and sanitary condition and appropriate for transportation of Food Shipments, including but not limited to ensuring that the Equipment is free from contamination, pest infestation, or evidence of prior cargo that could render the Food Shipments unsafe or adulterated. If Carrier transports partial load shipments (also known as less-than truckload, or LTL, shipments), Carrier shall conduct appropriate inspections and take necessary actions upon receiving the first shipment and each subsequent shipment to ensure that (a) the Equipment remains in safe and sanitary condition; (b) any Food Shipments will not be contaminated by any previously or subsequently loaded cargo; and (c) the temperature of any temperature-controlled Food Shipment will not be materially disrupted. When required by and as specified in the instructions of the Broker or of Broker's Customer, or in any Shipping Document, Carrier shall ensure that the cold storage compartments are prepared for safely transporting the Food Shipments. Carrier shall set temperature control to pre-cool mechanically refrigerated cold storage compartments before offering equipment with auxiliary refrigeration units for transportation of Food Shipments requiring temperature control and shall set the operating temperature to ensure the Food Shipments are, at all times, maintained at the temperature set point or within the temperature range specified on the instructions of the Broker or of Broker's Customer or in any shipping Document. Carrier acknowledges and agrees that its compliance with all temperature-related instructions related to each Food Shipment is a material term of this Agreement.

28. Carrier shall maintain all documentation and records related to the transport of Food Shipments governed by this Agreement, including those documenting personnel training, Equipment cleanings, sanitization and inspections, and the safe and sanitary transport of Food Shipments, including but not limited to: A. Evidence of the operating temperature of Food Shipments maintained during transport; B. Written policies, procedures and processes for maintaining food safety, including maintenance of temperature control, cleaning, sanitizing, and inspecting Equipment; C. Evidence of transportation traceability, including information regarding previous cargo hauled in bulk or in other Equipment, as well as maintenance and intervening cleaning procedures for docks and Equipment.; D. Appropriate training processes for each person under Carrier's supervision or control involved in providing the transportation services rendered by it in accordance with this Agreement; E. Evidence that the Food Shipments have not been rendered unsafe or been "adulterated" (as defined in ¶29 below) and have been transported under sanitary conditions protected from any physical, chemical, or microbial contamination, temperature abuse and excessive temperature fluctuations.

Upon the written request of the Broker, Carrier shall produce such documentation and records to Broker immediately or as promptly as practicable thereafter.

29. Carrier agrees that any failure to transport a Food Shipment in complete compliance with this Agreement and the written instructions and requirements set forth in the Shipping Documents (including any seal, temperature, quality control standards and delivery date requirements) shall result in such Food Shipment being considered unsafe and "adulterated" within the meaning of the FD&C Act (21 U.S.C. §§342(a)(i)(4), 342(i)). Carrier acknowledges and understands that adulterated shipments may be refused by the Broker, consignee or receiver upon their tender for delivery at destination, with or without inspection. Carrier bears sole and exclusive liability for its failure to comply with any of the requirements, covenants or obligations set forth in this Agreement. The Broker has exclusive discretion to determine the acceptability, salvageability and/or the adulterated status of Food Shipments transported by Carrier, and such determination shall be binding on Carrier. Broker is not responsible for and shall not be liable to Carrier for the failure of Carrier, the consignee, receiver or loader to adhere to their respective obligations under the laws and regulations governing the safe and sanitary transport of food for human consumption, including the Food Safety Laws referenced above.

30. OTHER REFRIGERATED LOADS. Carrier shall verify the temperature of refrigerated shipments, prior to loading or accepting the load, against the rate confirmation, bill of lading or other documents received by the broker. If there are discrepancies in temperature, or no temperature noted on the documents received, Carrier shall immediately notify the broker and shall not load or otherwise take the load until it receives the correct temperature in writing by the broker. Acceptance of the goods by Carrier shall mean that Carrier inspected the goods, that goods are in good order and immediately and effectively assumes full liability for such goods. Carrier shall write the recorded, set or pre-set temperature on any and all shipping document(s) related to the pick-up, transport, or delivery of Refrigerated Shipments, including without limitation any Bill of Lading ("Shipping Document").

Rev. 11/01/2020

31. <u>FORCE MAJEURE</u>.  In the event that either Party is prevented from performing its obligations under this Agreement because of an occurrence beyond its control and arising without its fault or negligence, including without limitation, shipper cancelling or postponing the load, war, riots, rebellion, acts of God, pandemics (including but not limited to COVID-19), acts of lawful authorities, fire, strikes, lockouts or other labor disputes, such failures to perform (except for any payments due hereunder) shall be excused for the duration of such occurrence. Economic hardships, including, but not limited to, recession and depression, shall not constitute Force Majeure events. If the carrier is informed by the broker, or broker is informed by the carrier, of force majeure at any time prior to the acceptance of the shipment at the shipper's facility, Carrier agrees to forfeit any payments due under the agreed upon rate for that shipment.  If the carrier is informed by the broker, or broker is informed by the carrier, of force majeure while the shipment or load is being transported by the carrier, the carrier agrees to return the shipment or load to the shipper, or to other designated place provided to the carrier by the broker, immediately upon receipt of the notice of force majeure and carrier agrees in that event to be compensated at the prorated rate by dividing the confirmed rate with total miles on the rate and multiplying that number by miles traveled from the shipper to the designated return spot.

32. CARRIER HEREBY WAIVES ITS RIGHT TO TRIAL BY JURY OF ANY CLAIM AGAINST BROOKER RELATED TO TRANSPORTATION SERVICES ARISING FROM THIS AGREEMENT.

IN WITNESS WHEREOF, BROKER and CARRIER are bound by this agreement. CARRIER agrees to be bound by the electronic signature of their authorized representative contained in the Signed Agreement Affidavit, and by doing so, represent and warrant that they accept and agree to the terms contained in this entire agreement and have been or are specifically authorized to execute this agreement on behalf of the organization they represent.

# EXHIBIT 2



Skyway Brokerage, Inc.
777 S Rohlwing Rd
Addison, IL 60101
MC: 633722  P: 224-222-0488  F: 630-953-4118

| LOAD NUMBER |
| --- |
| 113108 |

2/12/2022

## DISPATCH CONFIRMATION

| Carrier: | Summa Logistics, Inc. | MCID: | 965234 | Driver: | |
| --- | --- | --- | --- | --- | --- |
| | Burlington, IA | Reference: | | Cell: | |
| Ph/Fax: | (671) 500-1115   (671) 500-1115   (617) 500-0247 | Trailer: | | Truck: | |
| Attn: | | | | | |

| Load Info | | | | The Following Pay Is Authorized For This Load | | | |
| --- | --- | --- | --- | --- | --- | --- | --- |
| Pieces: | 0 | Miles: | 942 | Pay Code | Pay Type | Rate | Total |
| Space: | 24 | Pallets: | | Load | Flat | 3,100.00 | 3,100.00 |
| Act Wgt: | 13998 | Type: | Truckload | | | Total | 3,100.00 |
| As Wgt: | 13998 | Trailer: | Dry Van 53 | | | | |
| Value: | | | | | | | |

| Stop | | From | To | Name | City | St | Ref | Appt |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | | | | Address | Phone | Zip | Contact | Appt Ref |
| 1 | PU | 2/12 08:00 | 2/12 12:00 | CHINA AIRLINE- ORD 10601 FRANKLIN AVE SUITE 300 | Franklin Park | IL 60131 | | No |
| 2 | Del | 2/14 08:00 | 2/14 10:00 | GENERAL MOTORS 2919 EAST DIVISION STREET BI | Arlington | TX 76011 | | No |

| Commodity | Description | Pieces | Weight |
| --- | --- | --- | --- |
| | Reference | Space | |
| FAK | | 0 | 4,669 |
| | SBKK0239727 | 8 | |
| FAK | | 0 | 4,682 |
| | SBKK0239734 | 8 | |
| FAK | | 0 | 4,647 |
| | SBKK0239736 | 8 | |
| | Totals | 0 | 13,998 |
| | | 24 | |

2 Page(s)

Doc ID: 20220212062909026
Sertifi Electronic Signature

**DISPATCH CONFIRMATION** Page 2 of 2
Load No 113108 - 2/12/22

- Carrier represents and warrants there are no exclusions in its insurance policy that apply to the brokered load.
- Carrier shall only transport the load indicated in the rate confirmation and shall not reconfigure such load for any reason.
- Customer sealed trailers must not be opened for any reason. Failure to adhere may result in cargo liability claim against the carrier.
- In order to qualify for detention, Carrier must have signed in/out times recorded on BOL and POD and Broker must be notified of potential detention at least 30 minutes prior to the end of free time for approval; and, 2 hours after scheduled appointment or 2 hours after arrival on fcfs appointments.
- Broker must be notified of any additional charges at the time of occurrence and such charges must be verified and approved by Broker via revised rate confirmation. Failure to adhere shall result in non-payment.
- Carrier understands that driver assist and fuel surcharge is included in the rate.
- Double brokering is forbidden and shall result in non-payment.
- For temperature controlled loads, Carrier shall set and maintain the temperature noted on rate confirmation before arriving to the shipper for pickup. Prior to loading, Carrier must confirm that the temperature on rate confirmation matches the temperature on BOL and shall contact the Broker in writing and by phone immediately if any temperature discrepancy exists.
- Rate confirmation shall be void of Carrier was contacted more than two times with no response.
- Carrier assures and guarantees that all drivers will accept Active8 Track four (4) hours prior to pickup arrival unless otherwise advised in writing by Broker. Failure to adhere shall result on load being CANCELLED.
- Driver(s) and truck information provided to Broker must be accurate or truck will not be loaded.
- For team loads, Carrier assures and guarantees that two drivers will be present at the time of loading. If only one driver shows up, the carrier will be charged $500 or NOT get loaded.
- In the event of a breakdown, Carrier agrees that Broker may tender the load to another carrier and Carrier agrees and hereby expressly grants access to its trailer and allows such substitute carrier to repower and deliver the trailer with the load to its destination.

Carrier understands and agrees that Broker's business is built on and depends on good reputation, as well as, safe, secure, and timely delivery of loads brokered and, as such, Carrier agrees to pay, as liquidated damages and not as a penalty, in addition to Carrier's other obligation under this Schedule A, Broker/Carrier Agreement or rate confirmation, for any of the following occurrences and in the following amount:

Failure to activate Activ8 Track - $500.00; If Activ8 Track is turned off - $500.00 per occurance; Late POD - $25.00 per 30 minutes; Communication failure - $25 per occurance; Missed or Late pickup/delivery - $25 per hour

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*INVOICING\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*
PLEASE SEND INVOICE AND ALL SUPPORTING PAPERWORK TO BILLING@SKYWAYBROKERAGE.COM

\*\*\*POD shall be sent immediately following the delivery to track-trace@skywaybrokerage.com\*\*\*

| | | | |
|---|---|---|---|
| Allie Petrovic | 2/12/22 | *Ben Shelby* | 2/12/22 |
| Skyway Brokerage, Inc. | DATE: | ben@summalogistics.us | DATE: |